**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 07-20099-JWL |
| ) | |
| **TRINIDAD MARQUEZ-MARTINEZ (09),** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| _____) | |

**MEMORANDUM AND ORDER**

Defendant Trinidad Marquez-Martinez was charged by indictment with three counts on February 28, 2008, including: 1) conspiracy to distribute and possess with intent to distribute more than 1000 kilograms of marijuana and more than five kilograms of cocaine, 2) using a communication facility in causing or facilitating the commission of the conspiracy charge, and 3) aiding and abetting the attempted possession with intent to distribute 50 kilograms or more but less than 100 kilograms of a mixture and substance containing marijuana. (Second Superseding Indictment, Doc. 235, at Counts 1, 17, and 18). The matter before the court is Mr. Marquez-Martinez's Motion to Suppress Evidence (Doc. 275). Mr. Marquez-Martinez challenges the validity of the traffic stop conducted by New Mexico State Police officers on December 6, 2006. Mr. Marquez-Martinez argues that the initial stop, detention, and the eventual search of his vehicle violated his rights under the Fourth Amendment. The court began an evidentiary

hearing on this motion on November 24, 2008, continued hearing evidence on November 25, 2008, and concluded the hearing on December 12, 2008. The court then took the matter under advisement. For the reasons set forth below, the motion to suppress is denied.

## FINDINGS OF FACT

On December 6, 2006, at approximately 6:50 a.m., DEA Agent Shawn Vickers called Lieutenant Rudy Mora of the New Mexico State Police with an attempt to locate on a vehicle that could possibly contain contraband. Agent Vickers informed Lt. Mora that the vehicle, a white Ford Explorer or Expedition pulling a white trailer, was leaving from the Albuquerque area headed to Denver via northbound Interstate-25.

Lt. Mora subsequently stationed himself in the median between the north and southbound lanes near mile marker 278 on I-25 and monitored northbound traffic. Lt. Mora observed a white Ford Explorer pulling a white trailer pass by where he was stationed. He pulled out of the median and began to follow the Ford Explorer. In following the Ford Explorer, Lt. Mora noticed that it appeared to be following too closely behind the preceding tractor- trailer. Based on his training and experience, Lt. Mora believed the Ford Explorer was following the tractor-trailer too closely. He then utilized a stopwatch on his radar to verify the time distance between the two vehicles. As the first tractor-trailer passed a mile marker sign, Lt. Mora started the stopwatch on his radar gun and then stopped it as the Ford Explorer passed the same mile marker. In this case, the time elapsed was 1.2 seconds. Lt. Mora also observed the Ford Explorer

2

make a lane change and pass the tractor-trailer in what Lt. Mora described as "a not very safe lane change." After making these observations, at approximately 7:30 a.m.,[1] Lt. Mora activated the patrol car's lights and proceeded to pull over the Ford Explorer. When Lt. Mora activated his lights, the video recorder in his car was activated, documenting the stop. However, the alleged infraction for which the Ford Explorer was stopped was not recorded.

Lt. Mora approached the vehicle on the passenger's side and made contact with the driver via the passenger's side window.[2] Lt. Mora testified that at this initial contact, the driver appeared nervous and rubbed his hands repeatedly on his legs. Lt. Mora then identified himself, explained the reason for the traffic stop, and requested the driver's license of the driver, registration and insurance for the Ford Explorer. At that time, Lt. Mora received the registration, insurance for the trailer, and a bill of sale for the Ford Explorer from the passenger.[3] However, the driver explained that he did not have a driver's license on him.

---

[1]The court approximated all of the times in the fact section based on the running clock on the patrol car's video.

[2]The subsequent traffic stop was recorded, including audio.

[3]The passenger was eventually identified as John Kevin DeLuna, a.k.a., Mr. Trinidad Marquez-Martinez, the defendant. Throughout the video of the stop, Mr. Munoz and Lt. Mora refer to the passenger as Mr. DeLuna; however, it was eventually discovered that the passenger's real name is Trinidad Marquez-Martinez. Throughout the remainder of this order, when referring to the passenger by name, the court will use Mr. Marquez-Martinez.

3

Lt. Mora then requested that the driver accompany him back to his patrol car.[4] The driver explained to Lt. Mora that his name was Adalberto Munoz, that he only had a Mexican driver's license that he had left behind in Albuquerque by accident, and gave his address and date of birth. Lt. Mora then discussed the reason he stopped the vehicle and inquired about Mr. Munoz's travel plans. Mr. Munoz explained that they were coming from Albuquerque and going to Denver to deliver some furniture to the passenger's friend.[5] Mr. Munoz also explained that the Ford Explorer and trailer belonged to the passenger.

At this point, approximately 7:36 a.m., Lt. Mora returned to the Ford Explorer and checked the vehicle identification numbers (VIN). Lt. Mora also re-contacted the passenger and asked to see his driver's license explaining that Mr. Munoz did not have a valid license. The name on the license produced by the passenger was John Kevin DeLuna.[6] Lt. Mora also asked the passenger about his travel plans.[7] The passenger

---

[4]The conversation between the driver and Lt. Mora occurred outside of Lt. Mora's patrol car at the front right side. The entire interaction was captured on the patrol car video.

[5]Lt. Mora testified at the evidentiary hearing that Mr. Munoz's behavior and responses struck him as nervous or suspicious as it appeared he was searching for answers and avoiding eye contact.

[6]Lt. Mora testified at the evidentiary hearing that the passenger appeared nervous and that his hands shook when he gave the license to Lt. Mora. In fact, at one point in this encounter with the passenger, Lt. Mora asked the passenger "if he was okay."

[7]A majority of the conversation took place in English, but when discussing travel plans, Lt. Mora and the passenger switched briefly into Spanish.

4

explained that they were going to deliver some furniture and that he was going to take it to a friend by the name of Javier.

After checking the VIN on the vehicle and checking the passenger's license, Lt. Mora returned to Mr. Munoz and finished explaining the citation of following too closely. Lt. Mora explained the procedure for mailing in the fine and told Mr. Munoz that he would just give him a warning on not having a license, but he would not be able to drive any more on this trip. Lt. Mora returned the paperwork–the registration and insurance–to Mr. Munoz and told him to "have a good day."

At approximately 7:40 a.m., Mr. Munoz began walking back toward the vehicle when Lt. Mora called out his name. Mr. Munoz started walking back toward Lt. Mora, and Lt. Mora explained that he was "free to leave but [he] had a few questions for [Mr. Munoz]." Mr. Munoz agreed to answer more questions. Lt. Mora asked Mr. Munoz more questions about their travels plans, including where they were going, why they were going there, how long they were going to stay, and how long they had been planning the trip. Lt. Mora then asked Mr. Munoz if he had any drugs, large amounts of money, or weapons in the vehicle. Mr. Munoz denied having any of these items in the vehicle, and Lt. Mora then asked Mr. Munoz for his permission to search the vehicle and trailer. Lt. Mora provided Mr. Munoz with a Spanish translation of the consent to search form. Mr. Munoz then read the form, Lt. Mora confirmed that Mr. Munoz understood the form, and finally, Mr. Munoz signed a consent to search form. Lt. Mora then asked Mr. Munoz to stand over to the side of the patrol car, and had the other officer

with him pat Mr. Munoz down.

At approximately 7:44 a.m., Lt. Mora re-approached the Ford Explorer and re-engaged Mr. Marquez-Martinez in conversation, first explaining that he was "free to leave, but [he] had a few more questions." Mr. Marquez-Martinez agreed to answer more questions, and Lt. Mora again asked more specific questions about their travel plans, requesting more details about the furniture delivery and the planned length of their stay. Then Lt. Mora asked Mr. Marquez-Martinez if he was responsible for everything in the vehicle and if he had any drugs, large amounts of money or weapons in the vehicle. Next, Lt. Mora provided Mr. Marquez-Martinez with a Spanish version of the consent to search form. Initially, Mr. Marquez-Martinez wanted to sign the form without reading it, but Lt. Mora encouraged him to actually read the form. Then Lt. Mora asked if he had any questions about the form before Mr. Marquez-Martinez signed it. Lt. Mora asked Mr. Marquez-Martinez to step out of the car, and Lt. Mora patted him down. Lt. Mora requested that Mr. Marquez-Martinez step away from the Ford Explorer and to stand by a road sign. Further explaining that if he needed anything or had any questions to get Lt. Mora's attention, but not to approach the vehicle.[8]

Lt. Mora then obtained the key to the trailer door, and unlocked and opened the

---

[8]At approximately 7:48 a.m., at the conclusion of his interaction with Mr. Marquez-Martinez, Lt. Mora turned off the audio component to his video recording, but the rest of the stop/search was visually captured.

6

door to the trailer, but did not enter the trailer at this time.[9] At approximately 7:53 a.m, another officer arrived with a drug detection dog, and Lt. Mora instructed him to deploy his dog on the interior and exterior of the Ford Explorer and trailer. The dog alerted in the interior of the trailer, and the now three officers began to search the interior of the trailer removing the furniture and searching the furniture. The officers eventually discovered a false compartment in the front of the trailer, containing ninety-one packages of a substance that was field tested and indicated a positive reaction for marijuana. At approximately 8:14 a.m., Mr. Munoz and Mr. Marquez-Martinez were placed under arrest.[10]

## LEGAL ANALYSIS

"The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005).

> "The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular invasion of a citizen's personal security. Reasonableness, of course, depends on a balance between the public interest and the individual's right to personal security free from arbitrary

---

[9]The door to the trailer opened widely so as to obstruct the video camera's ability to capture exactly what Lt. Mora and his fellow officer on the scene were doing while waiting for the drug-sniffing dog to arrive. However, the video does show the two officers pacing around the trailer and to the side of the trailer, and possibly looking inside the back of the Ford Explorer, but the trailer itself prevents the camera from capturing exactly what the two officers were doing. Officer Mora at one point opens the back driver's side door and looks into the interior of the Ford Explorer.

[10]The video ends at approximately 8:19 a.m.

interference by law officers."

*United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (reh'g en banc) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1997)). "Its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Williams*, 403 F.3d 12-3, 1206 (10th Cir. 2005) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

**A. Initial Stop**

There is no question that "[a] traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *Bradford*, 423 F.3d at 1156 (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). There is also no question that Lt. Mora seized Mr. Marquez-Martinez, the passenger, along with the driver, when Lt. Mora pulled the Ford Explorer over for following too closely. *See United States v. Eylicio-Montoya,* 70 F.3d 1158, 1163 (10th Cir. 1995) (recognizing passenger is seized for Fourth Amendment purposes, when driver of car in which he is riding is pulled over for a traffic stop); *United States v. Erwin*, 875 F.2d 268, 270 (10th Cir. 1989) (same); *see also Brendlin v. California*, 127 S. Ct. 2400, 2406-08 (2007) (confirming an officer's stop of a car results in a seizure of both the driver and the passenger). "A routine traffic stop constitutes an investigative detention and is examined under the principles announced in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)." *Williams*, 403 F.3d at 1206. "The first inquiry under *Terry* is whether the stop was justified at its inception." *Id.* "The second *Terry* inquiry is whether the

officer's conduct during detention was reasonably related in scope to the circumstances which justified the initial stop." *Id.* (citing *Terry*, 392 U.S. at 20).

**1. Traffic Violation**

Mr. Marquez-Martinez first argues that Lt. Mora lacked justification to stop him for violating New Mexico Statutes Annotated § 66-7-318(A), which provides: "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc). "'When evaluating the reasonableness of the initial stop of a vehicle, our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'" *United States v. Alvarado*, 430 F.3d 1305, 1308 (10th Cir. 2005) (quoting *United States v. Zabalza*, 346 F.3d 1255, 1258 (10th Cir. 2003)).

In this case, Lt. Mora testified that he stopped Mr. Marquez-Martinez's vehicle for following too closely because, based on his training and experience, the Ford Explorer was traveling at a distance closer than was reasonable and prudent under the conditions. Specifically, Lt. Mora clocked the Ford Explorer as only 1.2 seconds behind the tractor-trailer. The New Mexico State Driver's Manual endorses the "three-second

9

rule"–suggesting that a car watch when the rear of the vehicle ahead passes a sign and count the seconds it takes for the following car to pass the same mark. *See* New Mexico State Driver's Manual, at 23-24. As the manual explains: "You are following too closely if you pass the mark before you finish counting" to three. *Id.* at 24. The manual goes on to explain that there are situations where a driver needs more space in front of his vehicle, namely, "when [he has] a heavy load or [is] pulling a trailer." *Id.* Lt. Mora, familiar with the three-second rule, testified that he initially– based on sight observation alone–thought the Ford Explorer was following the tractor-trailer too closely, and confirmed this suspicion by using his stop-watch on his radar to time the distance between the two vehicles. Given this information, Lt. Mora clearly had a reasonable, articulable suspicion that N.M.S.A. § 66-7-318 was being violated.[11]

**2. Traffic Stop/Consent**

> In the course of a routine traffic stop,
>
> a trooper may request a driver's license, vehicle registration and other required papers, run necessary computer checks, and then issue any warning or citation. Once those tasks are completed, a driver must be allowed to proceed on his way

---

[11]While it is unconverted that Agent Vickers asked Lt. Mora earlier in the morning to watch for a Ford Explorer pulling a white trailer, because Lt. Mora had a reasonable, articulable suspicion that a traffic violation was committed in his presence, it is irrelevant whether or not his real reason in stopping the vehicle was the suspicion that it may contain contraband. *See United States v. Whren*, 517 U.S. 806, 813-14 (1996) (explaining that an officer must simply have a valid reason to make a stop, whether that is the officer's actual reason or not); *United States v. DeGasso*, 369 F.3d 1139, 1145 (10th Cir. 2004) (noting the district court used "an improper subjective standard to evaluate the legality of the initial stop" and stating "the dispositve inquiry is whether the officer had an objectively justifiable basis" for the stop)

10

>unless reasonable suspicion exists that the driver is engaged in criminal activity or the driver consents to additional questioning.

*United States v. Gregoire*, 425 F.3d 872, 879 (10th Cir. 2005). "[O]nce the purpose for the stop is satisfied and the underlying reasonable suspicion dispelled, the driver's detention generally must end without undue delay." *United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir. 2006). In this case, the government argues that Lt. Mora developed additional reasonable suspicion of further criminal activity based on the behavior of Mr. Munoz and Marquez-Martinez while Lt. Mora talked with them and what Lt. Mora described as an implausible cover story.[12] The government also argues that Mr. Munoz and Mr. Marquez-Martinez consented to additional questioning.

"A consensual encounter is simply the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement official." *United States*

---

[12]The government argues that Lt. Mora had reasonable suspicion of drug trafficking which justified detaining Mr. Munoz and Marquez-Martinez until the drug detection canine arrived. The government points to Mr. Munoz rubbing his legs and fidgeting during his encounter with Lt. Mora, Mr. Marquez-Martinez's hands shaking when handing Lt. Mora the documentation pertaining to the vehicle, the two men's statements about their travel plans and their lack of specific knowledge about how long they would stay and where exactly they were going, and what Lt. Mora described as a rather implausible cover story regarding delivering furniture from Albuquerque to Denver. However, the court, having reviewed the video of the traffic stop, finds it equally plausible that Mr. Munoz and Mr. Marquez-Martinez were simply cold, rather than nervous or evasive, and Lt. Mora admitted while testifying that it was only upon seeing the type of furniture in the back of the trailer that he truly became suspicious of the furniture delivery story. Because the search was valid under the collective knowledge doctrine, as discussed below, the court declines to decide whether the behavior of the occupants here provided the requisite reasonable suspicion to proceed further.

11

*v. Patten*, 183 F.3d 1190, 1194 (10th Cir.1999) (quotation omitted). However, a "seizure," occurs when an individual does not objectively believe he can terminate the conversation with the officer and continue on his way. *Id.* "A detention for a traffic citation can turn into a consensual encounter after the trooper has returned the driver his documentation so long as a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information." *United States v. Wallace*, 429 F.3d 969, 974-75 (10th Cir. 2005) (quotation omitted). As the Tenth Circuit in *United States v. Bradford* explains:

> If an encounter between an officer and a driver ceases to be a detention and becomes consensual, and the driver voluntarily consents to additional questioning, no further Fourth Amendment seizure or detention occurs. A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority. A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer. Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter. An officer is not required to inform a suspect that she does not have to respond to his questioning or that she is free to leave. An unlawful detention occurs only when the driver has an objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her own way.

423 F.3d 1149, 1158 (10th Cir. 2005) (citations and quotations omitted). It is the government's burden to prove voluntary consent based on a totality of the circumstances test. *Gregoire*, 425 F.3d at 879. However, the Tenth Circuit "'follow[s] the bright-line rule that an encounter initiated by a traffic stop *may not* be deemed consensual unless the

driver's documents have been returned to [him].'"[13] *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1308-09 (10th Cir. 2006) (quoting *Bradford*, 423 F.3d at 1158). However, the return of a driver's documentation does not end the inquiry and automatically demonstrate that an encounter has become consensual. *Bradford*, 423 F.3d at 1158. Rather, the issue in that circumstance is "whether law enforcement conduct as perceived by a reasonable person would communicate that the person was not free to decline law enforcement requests or end the encounter." *Gregoire*, 425 F.3d at 879.

In this case, Lt. Mora returned Mr. Marquez-Martinez's driver's license to him. However, Lt. Mora, upon issuing the citation to Mr. Munoz, returned the documentation regarding the Ford Explorer and trailer to Mr. Munoz, not Mr. Marquez-Martinez.[14] Lt. Mora did allow Mr. Munoz to begin walking back to the Ford Explorer before calling out to him and asking his permission to ask him more questions; however, Mr. Marquez-Martinez had no way of knowing Lt. Mora had returned the documentation to Mr.

---

[13]An officer retaining a defendant's documents during a routine traffic stop is significant because it indicates that the defendant, in general, would not reasonably feel free to end the encounter with law enforcement. *United States v. Burch*, 153 F.3d 1140, 1143 (10th Cir. 1998). As a result, the government is unable to rely on a defendant's consent to justify the further detention, questioning, or search of a person or vehicle. Id. As explained in *United States v. Mendez*, 118 F.3d 1426, 1430 (10th Cir. 1997), while "determining whether an officer and driver are engaged in a consensual encounter typically requires the court to focus on the totality of the circumstances in a particular case, this circuit has consistently applied at least one bright-line rule: an officer must return a driver's documentation before the detention can end."

[14]Lt. Mora returned these documents to Mr. Munoz, despite knowing that the vehicle and trailer were registered in the passenger's, not the driver's name, and despite knowing that the passenger had handed him the documents in the first place.

13

Munoz. While Lt. Mora told both Mr. Munoz and Mr. Marquez-Martinez that they were "free to leave" before asking their permission to ask them more questions about the travel plans and ultimately gaining their "consent" to search the vehicle and trailer, there is no evidence that a reasonable person in Mr. Marquez-Martinez's position would truly feel free to leave.[15] While Lt. Mora had returned the documentation and had completed writing Mr. Munoz's traffic violation, there is no evidence that Mr. Marquez-Martinez knew that. Those events had all occurred in front of the patrol car, out of Mr. Marquez-Martinez's presence as he had remained in the Ford Explorer throughout the traffic stop. It is possible that Mr. Marquez-Martinez could have seen that Lt. Mora had allowed Mr. Munoz to begin to walk back toward the Ford Explorer, however, Mr. Munoz never made it all the back to the vehicle. A reasonable person could assume that Lt. Mora had detained Mr. Munoz further, asking him further questions. Again, even though Mr. Munoz consented to further questioning, there is no evidence that Mr. Marquez-Martinez knew this. When Lt. Mora re-approached the Ford Explorer after gaining Mr. Munoz's consent to search the Ford Explorer and trailer, Lt. Mora did state that Mr. Marquez-Martinez was "free to leave." However, Mr. Munoz had not returned to the vehicle, and

---

[15]A similar circumstance is described in *United States v. Guerrero-Espinoza*, 462 F.3d 1302 (10th Cir. 2006). Here, the Tenth Circuit held that the defendant's decision to answer a state trooper's additional questions did not constitute valid consent to prolong the traffic stop where the defendant, the owner/passenger of the vehicle, had no way of knowing the traffic stop had been concluded since the driver had never returned to the vehicle and the traffic stop had been completed outside of the defendant's presence. In this circumstance, the Tenth Circuit found that a reasonable person would not have felt free to leave.

Lt. Mora had returned the documentation to Mr. Munoz–not Mr. Marquez-Martinez, who was the actual owner of vehicle and trailer. It appears unlikely that Mr. Marquez-Martinez would have felt that he was truly free to leave, when as the owner of the vehicle he had no knowledge that Lt. Mora no longer had the documentation associated with the vehicle and the trailer and when his travel companion had never returned to the car. Therefore, Mr. Marquez-Martinez could not give truly voluntary consent. The traffic stop had ended when Lt. Mora returned the documentation to Mr. Munoz and written out the citation; however, so far as Mr. Marquez-Martinez knew the traffic stop had not yet ended. Therefore, Mr. Marquez-Martinez could not give truly voluntary consent to continued questioning and ultimately the search.

## B. Collective Knowledge

Regardless of whether Lt. Mora developed additional reasonable suspicion to continue to detain the vehicle until the drug detecting canine arrived or whether Mr. Munoz and Mr. Marquez-Martinez gave voluntary consent to search, Lt. Mora had sufficient probable cause to search the vehicle under the collective knowledge doctrine. The subsequent search of the trailer was, under the totality of the circumstances known to law enforcement at the time, based upon probable cause that there were drugs in the vehicle. Even though Lt. Mora did not have personal knowledge of the wiretap and other evidence DEA agents were privy to, he was entitled to rely on the representations as to probable cause provided by DEA agents.

The "collective information of police officers and law enforcement officers

involved in an arrest can form the basis for probable cause, even though that information is not within the knowledge of the arresting officer." *United States v. Karr*, 774 F.3d 1029, 1031 (10th Cir. 1985) (citing *State v. Clark*, 218 Kan. 726 (1976)). The Tenth Circuit has held that reasonable suspicion may be established through the collective knowledge of officers involved in the investigation. *United States v. Merritt*, 695 F.2d 1263, 1268 (10th Cir. 1982). As explained in *United States v. Wright*, a law enforcement officer may act on probable cause from another officer based on the "well established rule that when an order to stop or arrest a suspect is communicated to officers in the field, the underlying facts constituting probable cause or reasonable suspicion need not be communicated, so long as the individual or agency issuing the order can justify the intrusion on Fourth Amendment rights." 171 F. Supp. 2d 1195, 1202 (D. Kan. 2001) (citing *United States v. Shareef*, 100 F.3d 1491, 1503 (10th Cir. 1996)).

Defendant argues that the collective knowledge doctrine has no application in this case because Lt. Mora "did not stop the Ford Explorer based on probable cause (or reasonable suspicion) the occupants were engaged in drug trafficking but because the driver supposedly had been following another vehicle too closely." (Doc. 390, at 5). Defendant further argues that Lt. Mora "knew nothing about the information in possession of the DEA regarding Defendant Marquez." However, this is not true. Lt. Mora was advised by DEA Agent Vickers to be on the look out for a white Ford Explorer pulling a white trailer traveling northbound along I-25 and he was advised that it might contain some kind of contraband. Given the source of the information and Lt.

Mora's own training and experience, Lt. Mora should have had a pretty good idea that the contraband was probably related to drug trafficking (i.e., either money or illegal drugs). In addition, as discussed in *Wright*, "the underlying facts constituting probable cause or reasonable suspicion need not be communicated, so long as the individual or agency issuing the order can justify the intrusion on Fourth Amendment rights." 171 F. Supp. 2d at 1202. The Tenth Circuit in *United States v. Chavez* also discusses how "a police officer may rely on the instructions of the DEA (or other law enforcement agencies in stopping a car, even if that officer himself or herself is not privy to all the facts amounting to probable cause. 534 F.3d 1338, 1347 (10th Cir. 2008); *see also United States v. Ramirez*, 473 F.3d 1026, 1037 (9th Cir. 2007) ("Where one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment."); *United States v. Williams*, 429 F.3d 767, 771-72 (8th Cir.2005) ("[W]e also hold that the collective knowledge of the DEA team was sufficient to provide reasonable suspicion to stop [the co-defendant's] vehicle, and such knowledge was imputed to the officer at the scene when he received [another officer's] radioed request."); *United States v. Burton*, 288 F.3d 91, 99 (3d Cir.2002) ("[T]he arresting officer need not possess an encyclopedic knowledge of the facts supporting probable cause, but can instead rely on an instruction to arrest delivered by other officers possessing probable cause."); *United States v. Ibarra-Sanchez*, 199 F.3d

753, 758-59 (5th Cir.1999); *United States v. Celio*, 945 F.2d 180, 183 (7th Cir.1991). As explained in *Chavez*, there must be some communication between the officer or officers with probable cause and the officer who executes the search as this communication confirms that the officers are functioning as a team. 534 F.3d at 1347 n.13. Therefore, the amount of information conveyed to Lt. Mora is not legally significant as none of the cases that discuss the collective knowledge doctrine focus on the amount or quality of information conveyed to the stopping officer. As the government points out in its brief on the applicability of the collective knowledge doctrine, such a requirement would not further the protection provided by the Fourth Amendment to individuals from unreasonable searches and seizures. (Doc. 391, at 3).

As related exhaustively by Agent Doug Dorley at the evidentiary hearing and as described in the second subsection of the government's relevant facts section in its response to the defendant's motion to suppress evidence,[16] there was an abundance of

---

[16]During approximately a sixteen-month investigation, Kansas City, Denver, Virginia, and Albuquerque DEA agents worked together to identify the individuals involved in an extensive drug trafficking organization that supplied marijuana and cocaine from Mexico to buyers and other sellers in the Kansas City metropolitan and Richmond, Virginia area. DEA identified Mr. Marquez-Martinez, a.k.a. "Profe," as one of the main couriers of drugs transported from Mexico to Kansas City. DEA agents intercepted phone calls from the head of the Kansas City drug cell, Rene Garcia, from May 2006 to November 2006. In this period, there were 87 intercepted "pertinent"(drug related) phone calls between Rene and Mr. Marquez-Martinez and 235 pertinent calls between Rene and other co-conspirators in which Mr. Marquez-Martinez was mentioned. In addition to the intercepted phone calls, DEA agents had posted pole cameras outside of two stash houses utilized by the organization. The defendant was repeatedly captured by the pole camera video at the Roeland Park house and Lafayette house with first a
(continued...)

probable cause that Mr. Marquez-Martinez and Mr. Munoz were transporting drugs in the Ford Explorer and/or trailer on December 6, 2006. *See* Government's Response to Defendant's Motion to Suppress, Doc. 386, at 6-14. Therefore, even if Lt. Mora had not developed his own reasonable suspicion to prolong to the stop while waiting for the drug detection canine or if Mr. Munoz and Mr. Marquez-Martinez did not provide valid consent, the search of the Mr. Marquez-Martinez's vehicle and trailer was lawful due to the collective knowledge doctrine.

IT IS THEREFORE ORDERED BY THE COURT THAT defendant Mr. Marquez-Martinez's motion to suppress evidence (Doc. 275) is denied.

IT IS SO ORDERED.

Dated this 22nd day of December, 2008, in Kansas City, Kansas.

---

(...continued)
black Expedition and the white trailer and later the white Ford Explorer and white trailer. DEA also engaged in direct surveillance of various members of the organization, and between August and October of 2006, several loads of drugs and money were indicted because of information learned during the investigation.

Leading up to the December 6, 2006 stop, Rene had a phone conversation with another member of the organization in which he asked if "everything was ready out there with Profe and the boys." Rene then called the defendant directly, and the two talked about when the defendant would be taking off. The defendant stated he was waiting on his "cousin." The defendant advised that his "cousin" was to arrive later that day and wanted to leave early the next day. Rene subsequently called his "right hand man" who lived at a stash house in Kansas City to advise him that the defendant would be "taking off tomorrow." Based on these intercepted phone calls and the investigation to date, DEA was confident that the defendant would be transporting drugs from Albuquerque to Kansas City the next day.

19

                                          s/ John W. Lungstrum
                                          John W. Lungstrum
                                          United States District Judge